We are honored to have sitting with us this morning, as a visiting judge, Judge Paul Etkin of the Southern District of New York. Welcome, Judge.  We have five cases on the calendar this morning. One from the District Court, one from the Claims Court, one from the Trademark Board, one from the Merit Systems Protection Board, one from the Court of Appeals for Veterans Claims. Only the District Court and Claims Court cases are being argued. The rest are submitted in a brief. Our first case is Constellation Designs v. LG Electronics, 2024-18-22. Mr. Schwentker. May it please the Court, Andy Schwentker on behalf of LG. I'd like to begin with patent ineligibility, which is dispositive of the appeal. The District Court committed two fundamental errors in granting summary judgment of eligibility for Constellation Designs for patents. The first error was finding that the 761 patents claims directed to black box optimization recited patent-eligible subject matter. The District Court then compounded its error by granting summary judgment of eligibility for the 700, 509, and 922 patents, even though there's no optimization limitation in those three patents asserted claims. Now, at ALICE Step 1, all of the asserted patents claims are directed to abstract ideas. For the 761 patent, the abstract idea is using a non-uniform constellation optimized for parallel decode capacity. As in HAWC technology, the 761 claims recite result-oriented language optimization. Counsel, I understand the argument you're making with respect to the 761 claims and the 700 claims. I was wondering if I could ask you, what do you think the abstract idea is that the 509 and 922 claims are directed to? And I read the red brief, this is, I guess, a two-part question, as arguing these claims separately. So if you could answer whether you think the claims are argued separately and also what you think. I know that you're arguing that those are ineligible as well. I'd like to know what you think the abstract idea those are directed to, because I think I see those claims as being perhaps different. Yes, Judge Stoll. So the 700 and 509 patents claims are similar. The 509 patent claims have the additional requirement about overlapping constellation points. And this ties into the 922 patent claims as well. So the 922 patent claims, the abstract idea is a representation of a signal as a constellation. And you can see even in the red brief that a constellation is really just a two-dimensional mathematical representation of a signal. And that's, for the 922 patent, what we believe the abstract idea is. It's a mathematical representation of a constellation. And cases like Hawk Technology and Stanford confirm that manipulation of data, mathematical representations, mathematical formulas, those are not patent-eligible ideas. Those are abstract ideas. What if it's, though, I would say that's probably true if that's all the claim is directed to. But what if it's an application of the mathematical formula or, you know, this is an application of the constellation. It's a specific constellation that is intended to resolve a particular technical problem. Why is that not right? So we know from cases like Myriad that simply reciting the abstract idea here, a mathematical representation, and saying apply it is insufficient under patent eligibility case law. Well, Myriad was a natural products case, a different kind of case. I understand, Judge Lori. But numerous cases from this court have also held that simply reciting the abstract idea and saying apply it is insufficient to confer patent eligibility. And here that's what the 922 patent claims are doing. The other components in the claim are simply conventional receiver components. And so the claim is, you know, reciting the conventional receiver and then saying to apply or use this constellation. There's nothing additional within the claim that would, you know, take it beyond, you know, simply applying, you know, saying to apply the abstract idea. What if this claim said, you know, it gave the result? For example, it said, you know, wherein the result is that you have a lower reduced signal to noise ratio. Would that change your answer? If it were just that, I don't think so. What do you think the claim would require in order to make it not abstract? Perhaps specificity around the, you know, reduction in signal to noise ratio. Also perhaps a, you know, some description of how to apply the constellation other than just, you know, conventional. I didn't think that's what the invention was directed to, how to apply the constellation. I thought what the invention was directed to was the development of the constellations. Am I wrong? Well, I think you're right. I was just, you know, trying to answer the hypothetical, you know, what might cause this to be a patent eligible. So in your view, probably there's very little that a person could do with this invention to make it eligible. Nothing in the specification. You know, if it's just the creation of a new constellation for purposes of the way constellations have always been used, then it's not going to be eligible because it's, in your view. Do I understand that correctly? I don't know. I mean, they have dozens of patents, and, you know, perhaps there are other ways that they can claim these in a way that takes them outside of the, you know, the realm of abstract ideas. But at least with the claims that we're dealing with here, you know, they are squarely within the realm of abstract ideas. I did want to get back to- Can I ask you about the 761 and the 700 patents real quick? For those, Joy, I think I read your argument and understand it as saying those claims are like the claims the Supreme Court rejected in Morse, in that they don't- Morse claims were directed to the use of electromagnetism, however developed for purposes of marking or printing intelligible character signs or letters. Do you think that that's- the claims in the 761 and the 700 are analogous to that? I think that's fair. I think they're analogous to many other claims that have fallen under 101 as well. You know, we recite the Hawk Technology case, the Stanford case, the Electric Power Group, the two-way media, you know, there are numerous cases that I think these claims are similar to. They recite result-oriented language without providing any details about how to obtain those results. I did want to get back to the 509 patent briefly, which you asked about. So the 509 patent, it recites the same abstract idea of selection of a paired code rate and a non-uniform constellation. It adds the overlapping constellation points, but in our view that's, again, you know, similar to the 922 patent. That's a mathematical representation of a signal. It's just saying there are overlapping constellation points, and we know that layering, you know, one abstract idea on top of another abstract idea is not sufficient to confer eligibility. As a technical matter, what am I to understand from the locations of at least two of the constellation points are the same? Does that mean it's non-uniform? It is non-uniform. I'm just trying to understand technically. Is it saying anything more than that, that it's non-uniform? It's saying that there are constellation points that are in the same location. Okay. But that's it. Okay. Could I ask you a little more about the 761 patent? In the district court, the argument was essentially this is optimization and you can't ‑‑ that goes to an abstract idea. But the emphasis of your friend on the other side seems to be that this really is optimization specifically by reference to parallel decode capacity. And I guess why isn't that ‑‑ what is it about parallel decode capacity that isn't an innovative concept or isn't something specific enough to be not going to an abstract idea? So parallel decode capacity is a concept that already existed in the prior art. We know that from the summer reference. And it's just a measure of the amount of information from the coder to the decoder. And the claims, the 761 patent claims are just saying to optimize for this measure without telling you how to do so. Are there different ways to optimize for parallel decode capacity? Yeah. And that's part of the problem here. The claim is attempting to preempt the entire endeavor of optimizing for parallel decode capacity simply by reciting that desired result in the claim without providing any mechanism for doing so. I wanted ‑‑ if there are no further questions on patent eligibility, I wanted to turn to non‑infringement. So there are two legal flaws with Constellation Design's standards-based infringement theory at trial. And these flow directly from Fujitsu and its progeny, which permit a narrow exception if the reach of the claims includes any device that practices the standard. And there's two requirements built in there. One is to compare the claims to the standard. That's what Fujitsu and INVT in those cases require. And if the standard does not provide enough specificity, then those cases require the normal comparison between the claims and the accused product. The other aspect of this narrow exception in Fujitsu and INVT is that the product has to practice the standard. And here the ‑‑ so neither one of these requirements is met here, or even arguably met here. It's ‑‑ You're saying that your product doesn't practice the standard? The product must practice the standard. So Fujitsu provides a narrow exception if the reach of the claims includes any device that practices the standard. And the standard that's at issue here, the A322 standard is a transmitter standard. And so it's not a standard that the accused television receivers could even arguably practice. How do you respond to Judge Gilstrap's interpretation of Fujitsu saying, you know, Fujitsu doesn't mean that the only way that you could rely on the standard for purposes of showing infringement is when the standard covers every limitation of the claim. But instead, it is providing certain protections to make sure that someone's, you know, not using the standard in an improper or unreliable way. And so the protections that come with Fujitsu with respect to the whole claim should just apply when you're looking at a particular single limitation. What is wrong with that interpretation? It seems pretty commonsensical for patent law to me. A couple of responses, Judge Stoll. So first of all, Fujitsu and INVT, I believe, foreclose that path because they require that if the standard does not provide the level of specificity required to show that a claim is standard essential, then the patentee has to follow the ordinary course of comparing the claim to the accused product. The other aspect here is by allowing less than a full claimed invention compared to less than a, you know, compared to a standard that's not even arguably directed to the accused product, it's eviscerating the guardrails around the standard essentiality requirement, you know, in Fujitsu and INVT in those cases. Was the jury instructed on Fujitsu, or was there any objection made to the experts' reliance on this methodology for showing infringement? We objected. We raised this in a pretrial motion challenging the reliance on the standard here. I'm just thinking about it in terms of like JMAW. For JMAW, what we're doing is we're looking at whether there's substantial evidence to support the jury's verdict. So I guess your view is that there shouldn't be any reliance on the standard, so that means that one limitation, the jury, there's no evidence to support it. Right. The, yeah, as a matter of law, what Constellation Designs and Dr. Jones did here was flawed. You know, they relied on a standard without showing that the, you know, without comparing the claims, the full scope of the claims to the standard, and they also relied on a standard that is indisputably not directed to or practiced by LG's televisions. It's a transmitter standard, and the, you know, if there's a, so reliance on a standard as a proxy for infringement means that the mapping has to be 100% dead on, and there's no dispute that that wasn't the case here. And so that, as a matter of law, is a failure in their presentation. Can I ask you a quick question on damages? Yes. If this court were to determine that some of the patent claims are eligible and some of them are ineligible, what happens to damages? So, obviously, as we've laid out in our brief, we think that the damages theory presented by Constellation Designs is fundamentally flawed. But even setting that aside, if this court were to reverse on patent eligibility, then the damages verdict should also be vacated for that reason as well, because the way this case was tried, all of the claims were, you know, just kind of lumped together. We don't know how the jury arrived at its decision, whether it placed more value on, you know, the 761 patent claims, for example, than other patents. Certainly it would have been a very different trial if the 761 patent had not been at issue because, you know, that's the one that claims optimization just kind of in the abstract and the other claims don't recite the optimization. And also, do you recall by any chance how the damages evidence was presented? Was there any apportionment for the different patents or consideration of certain patents were found infringed in certain work, or were they all lumped together by your friend on the other side's expert witness? Well, they were all lumped together by Constellation Designs' expert, and that's part of the fundamental problem with their damages theory, that they relied on a one price for all patent damages model, which this court's cases like Omega Patents preclude. So that was how it was presented to the jury, but we also don't know what happened in the jury deliberation room and how they, you know, we know that they reached the royalty rate espoused by Constellation Designs' expert, but we don't know if the 761 patent, for example, supported most of that value or what have you. So long story short, if this court, you know, does anything on patent ineligibility, as we think it should, then the damages verdict for that reason should also be vacated. Counsel, you've exceeded your time for answering questions. We'll give you your rebuttal time back. Let's hear from Constellation. Mr. Wall. Judge Lurie, and may it please the court. Judge Stoll, if I can go to your very first question, because I think it's the only real legal question in the case. At bottom, infringement and damages are all subject to a substantial evidence standard. Set aside for just a moment the 509 and the 922 patents, because I think the analysis on those falls out pretty easily once you have the 761 and the 700, and I want to try to convince the court not just that they're patent eligible, that it's not a closed case. If you look at the language in 761, it's on the very first page of our brief, Roman at I, right after the cover, and you read it in light of the specification, which appears at page 135 of the appendix, here's what's going on. When Drs. Jones and Barsoom are sitting there in the NASA lab, and he explains all of this starting at page 20172 of the appendix, everybody's focused on the output from the demodulator. You translate the waves into these symbols or points on the map. There's one of them at page 6 of our brief, and everybody's focused on trying to get those symbols closer to the grid points. And what Jones and Barsoom say is, well, wait a minute. You're looking at the wrong thing. You ought to look at the result not of the demodulator, but the demapper. Compare the bits going into the mapper on one end with the bits coming out of the demapper on the other. That's parallel decode capacity, which people were not focused on. And see if by moving the points around on the constellation, you can get better bit quality on the back end. Turns out you can. Counterintuitively, if you move the points closer together instead of, as everybody else had been trying to do, further apart, you can produce really substantial gains, approaching what's called the Shannon limit. That's the graph that's on page 11 of our brief. So when they draft up the claim, it is a receiver using non-uniform constellations, optimized for parallel decode capacity, that at a given capacity signal-noise ratio outperforms your uniform capacity. That's the D-min part at the end of that claim language there. And so I look at that, and I say, wait a minute. That's concrete all the way down the line. That's a different output. It's assessing it based on a different means, and it's producing different constellations that in the real world of digital communications give you a much more efficient over-the-air broadcast. Everything about that indicates that it ought to be eligible for patentability under the Patent Act. So whether the court looks at the claim language, reads it in light of the specification, as I say, I think the testimony from the inventor on this is very helpful, because Dr. Chris Jones testified at trial. But one of the things I'm concerned about is this language, optimized for capacity. And it does say how it's optimized, using something, the parallel decode capacity. But that's pretty broad language. It feels abstract, because, you know, it's not saying how you do it, which I agree. Your patent specification, I think it's Figure 5, has some good detail in there on how you do it. But it's not in your claim. And I understand the desire of having a claim that recites every single way of optimizing for capacity using parallel decode capacity. But I don't know that that's what your invention is. So I just want to give you my feedback so that you can respond to it. Yeah, totally fair. So I think it goes to one of the questions you asked earlier, right? There are different ways to optimize. You can optimize for things other than parallel decode capacity. How many other things? Well, you can optimize for joint capacity. There was some testimony about that. People were using Gaussian distributions before Jones and Barsoom came along. But there's no testimony in this record that you can optimize using parallel decode capacity in multiple ways, because parallel decode capacity is the metric. You start moving around the points on the constellation, and the comparison between bit quality on the transmitter end and on the receiver end, that metric, that's parallel decode capacity. So you can do it other ways. Other people were. You were looking at the stuff coming out of the demodulator and trying to get the points closer to the grid points, the symbols closer to the grid points. But looking at the demapper results and the bit quality, that's parallel decode capacity. There's nothing that's in this. Has parallel decode capacity been defined in this case? Was it construed? I don't think anyone asked Judge Gilstrap to construe that specific term in the claim. But there was a lot of testimony at trial about what parallel decode capacity is, why people weren't using it before Jones and Barsoom came along, and why what they brought to the table was a really inventive concept. But this is summary judgment, so it doesn't really matter, right? I mean, that's right. My point is just they didn't walk in and say, there's a real lack of clarity around parallel decode capacity. We can't understand what that is from the claim language in light of the specification. Everyone, I think, agreed, and I don't see anything in their brief in this court to suggest, that everyone didn't agree that parallel decode capacity was a specific way, a metric of comparing the bit quality on one end with the bit quality on the other. But is it more than a measurement or an aspirational thing, a goal? Is it just a measure of parallel decode capacity, or is it something specific? I would say it's a technique. So, for instance, if you look at a case like McGrow, this court says, all right, look, that's about sort of animation, and trying to match up facial expressions with sounds. And everybody was doing one facial expression per sound. And then the patent there said, no, you should. Can you help us, instead of talking about our prior cases, could you help us? We're struggling here, I think, both of us, with what is the meaning of parallel decode capacity in the way that you're talking about it. You're trying to say that this is something concrete, right? It's not just a measurement. So maybe turning to the specification and helping us understand in that sense might be more helpful than talking about McGrow. Sure. So I'll pull up the specification at page 135, but I was going to pull around McGrow to say there it was a technique, too, because there it was assigning the facial expression to one sound, and the patent was assigning it to a set of sounds. And so the claim there was the same as here, Judge Eck. And it was like, look, that's a technique that's not patentable. And what this court said was, but it's a technique that people hadn't been using, and it was a new and inventive way of using that technique to achieve a real concrete gain in the real world. There, better animation. Here, better over-the-air broadcasts. So once they come up with optimizing for parallel decode capacity, once you start using that technique, you produce these non-uniform constellations, which are the opposite of what everybody had been doing. They were doing uniform. And so they produced these non-uniform constellations, and it turns out they work far better. You get a much more efficient broadcast. You get like the same kinds of gains you had seen collectively in the previous 40 years. So to my mind, yes, you are looking at a different output, you're applying a different technique, but what you're doing then is you're producing these different constellations that work a lot better in the real world, and all of that together is a concrete, specific advance. It's not just optimization. It's not just go do something with parallel decode capacity. It's take a receiver that uses non-uniform constellations that have been so optimized and that will, compared to uniform constellations at a given signal-noise ratio, produce a better channel capacity, right, a better over-the-air broadcast. Mr. Schwenker says in his brief that you can't get around the summer reference, and there's earlier reference in summer to parallel decode capacity. How do you respond to that? So it's not a reference in summer to parallel decode capacity. It's a reference to shaping gain, and it doesn't have anything I think to do with 101 with all respect, Judge Atkin. It can be relevant to either 102 or 103. They brought obviousness challenges at trial. They lost all of those in front of the jury. They haven't brought them again here. So whether or not this was obvious in light of the prior arc or novel, those are other claims. They don't go to whether what these fellows did in 2006 was an abstract idea or a concrete and specific improvement in the field of digital communications technology. Just to be clear, it's not talking about what these fellows did. It's talking about Claim 17 of 761-PAD. Absolutely right, Judge Phil. So when I say what they did, what I mean is they did something concrete. I'm worried about the claim. So I think they, sort of to your questions earlier, I think they wrote the claim in as concrete a way as they could have, which is to say obviously the patents 509 and 922 are claiming specific kinds of constellations. So I think those are even more concrete. But what they were doing in 2006 was saying, look, we are designing our constellations by optimizing for parallel decode capacity, which is to say we're moving the points on the constellation closer together rather than farther apart to increase the bit quality on the back end so that we have better bits being fed into the decoder and then ultimately on the back end a better broadcast. Some of the things you're talking about, like looking at the demapper and doing this, they're just not in the claim. That's one of the concerns. And instead you've got optimize for capacity using parallel decode capacity without saying how you do that. It's any optimization whatsoever, any technique that would optimize parallel decode capacity. So, sorry, that's the point I was trying to make earlier. It's not any technique for optimization, which is to say it's not doing optimization the way people were doing it pre-2006. I understand. It's optimizing using parallel decode capacity. That's right. But it's any way to optimize. Help me understand because my understanding is that there's different ways that you could optimize for capacity using parallel decode capacity. Sorry, so that's not right. That right there, maybe that's the nub of the dispute. There is no testimony in this record that says there are different ways of optimizing for parallel decode capacity. Parallel decode capacity is a way of optimizing, which is to say I'm moving the points around, and I'm just looking to see are the bits getting closer on the back end to what got fed into the mapper here. So it's one metric. I'm trying to improve that one metric. And if I can get improvement along that one metric, then I've got a better broadcast on the back end. And so that's why I say all of this other stuff about the demapper and everything else, that belongs in the specification. The claim itself is a receiver using non-uniform constellations that have been improved with this technique. In other words, I've moved to the point to get the bit quality on the back end the best that I can get it, and then that non-uniform constellation gives me a concrete gain in the here and now over a uniform constellation. So I'm not trying to fight the question, Judge Stoll. I don't know if I'd been sitting there and I had designed this, what I would have done differently in terms of writing this claim other than to say, everybody else has been using uniform constellations that have been optimized a different way. I want a non-uniform constellation that I have made the best I can by using parallel decode capacity. I'm looking at a different thing in the process than what everybody else has looked at, and I would end up with a claim exactly like this. If I could just clarify, the 2007 article was the breakthrough article by the inventors. Does the patent date back to 2007 or 2008 somehow? I believe it does.  I don't know if the Court has any questions on infringement or on damages. Judge Stoll, on damages, to your question, in many cases where you knock out particular claims, it does affect the damages. On the specific record here, it wouldn't. Mr. Schwinker's right. Our expert testified, this is at page 20280 of the appendix, that the licensing fee would have been the same with respect to any of the patents, but it wasn't just our expert. Their corporate representative, Richard Lewis, testified at 20333. He's an LG employee now, but he actually was at Zenith and helped negotiate the licenses that were at issue for comparability purposes, and he testified that the earlier $5 fee for the Zenith licenses was also not tied to any particular family. It was, as here, about a technology, the physical layer of this ATSC standard. So on the particular facts of this case, if you found that some of the claims were not patent eligible, it wouldn't affect the damages award in this particular case because of the testimony. On to Mr. Schwinker's point that we don't know how the jury valued the different patents, and if some of them were to survive and some of them weren't, how can we know how the jury valued it? I mean, I think that's a fair point. Well, except that the testimony from both of the experts was that the value of the licenses that were what the jury used for comparability, the Zenith licenses, the testimony from both sides was that that value wasn't tied to any particular patent within the group. It was about a group of patents and a particular technology. Here, obviously, it's the technology that goes into what we call the physical layer of the ATSC standard, which is the constellations used by the receivers to pick up the broadcasts. So I would say on this particular record, there would not be a basis to remand it back to the district court and have a new trial on damages because if they had tried to argue that the license value was in some way tied to particular patents in the group, then maybe, but here they didn't make that argument below, and their own corporate witness said, no, that's not how I negotiated the licenses. But isn't that approach inconsistent with the Omega case, which rejected the one-size-fits-all royalty approach? I don't think so, Judge Atkin, because in a case like Omega, the previous license was based on a whole group of patents, and then only one or two had been asserted in the follow-on case, and the expert hadn't done anything to show that the value of the former license was actually tied to the now-asserted patents as opposed to some of the other patents that had been in the group that were earlier licensed. Here, it's a very different situation. It's a group of patents around a technology that gets licensed, and then the expert comes in and says it's a corresponding group of patents now around the same kind of technology, and you have both sides saying that the earlier license value wasn't tied to any of the particular patents. So to me, there's a lot more correspondence in a case like this than in a case like Omega or Rex Medical, where there really was a concern that that earlier value was tied to some of the unasserted or uninvolved patents, and that's just not on the table here. It seems to me that the 707 patent claims or, sorry, 761 patent claims are extremely broad as compared to, say, the later claims in a 922 patent. So why would it be reasonable to think that the reasonable royalty might change based on what that claim is related to? I think for the reason that our expert gave below and that they did not meaningfully dispute at the trial, which was this is really just about the technology. As I say, that sort of physical layer, the constellations that the receivers are using, and so the earlier licenses went to that group of patents that covered that technology, and so too here. And the testimony at trial was unequivocal that the standard, the constellations covered by all the patents, are practiced by the standard. So if any of these patents is patent eligible, our expert said, they would have paid the same fee because they're practicing the standard and the standard uses the constellations covered by the patent. I do hope, though, I know that if you just looked at it, you might think it would be broad if there were lots of different ways of optimizing for parallel decode capacity and you thought we were trying to claim and preempt the entire field, but that really isn't what went on with this particular patent, and it isn't as broad as it seems. Because it is a technique or a metric for optimizing, but it's... But it could result in a lot of different constellations, right? I mean, there's a lot of different constellations that would satisfy that claim, right? I mean, yes, Judge Stoll. Well, yes and no. Keep in mind this is talking about at a given code rate and at a given signal-to-noise ratio, and there are other ways of optimizing and other ways of doing this. But it is right that if you are optimizing for parallel decode capacity, yes, it does claim those non-uniform constellations. I just don't think that that goes to the Alice question, which is not sort of, you know, did you come up with an inventive concept that has a number of concrete applications, but did you come up with something concrete as compared to something abstract? And here, if they had just claimed optimization, if it were a sort of case like that where this were a sort of vague or not very good patent, I'd understand it. But here they were very specific about how you optimize and what it produces, and particularly right in light of the specification. I just don't see any abstractness there. So let me try to say that I think this case is a little bit different, that I see it a little bit more like a Morse case, where it's that the claim is so broad in claiming an end result with functional language as opposed to having a specific technical solution. You're familiar with the Morse case, right?  So to me, it is far more specific than a case like that, again, because it's not like it's just claiming the result or just claiming the technique. It's sort of saying we're looking at a different output, we're judging it by a different means or metric, and we're getting an entirely different set of constellations that are sort of counterintuitive from what the rest of the field had been doing. And so to me, it's the combination of all of those that gives you real concreteness. We're telling somebody exactly what you get and how you get there. You use this particular technique. There's no testimony here that the technique is to optimize using parallel decobastic. That's right. And I know after the fact... How do you optimize? Is this Figure 5? It is in part Figure 5, but I think the best explanation actually is if you read Dr. Jones' testimony at pages 20, 172 to 175 of the appendix. He says, look, we had this kind of aha moment where we thought we could start looking at bit quality coming out of the demapper. So we wrote this software to optimize, which is to say we'd start moving the points on the constellations and seeing whether we got better bit quality that we could feed into the decoder. And right away, we saw massive gains, like on the order of 25%. We'd been laboring with the whole field for decades to try to achieve a 1% or a 2% gain, and all of a sudden, we start operating the software, moving the points, looking at the bit quality, and we get like 25% gains. It's staggering. It's sort of stuff like I couldn't have achieved in a career, basically, he says. And so in terms of how you actually implement it, they designed some software in order to move the points, look at what it did to the bit quality, and try to come up with an algorithm in order to optimize. And what they discovered was not just was moving the points closer together better, but in some cases, putting the points right on top of each other. That's the 509 patent, right, a constellation with two identical points. And nobody would have thought to do that before Jones and Barsoom came along. And that's as concrete as it gets. Yes, 509 and 922 are sort of the more concrete examples of that. It's like an application. An application almost. But I still think that the manner in which you get there is equally concrete. It produces different sets of constellations, some with two identical points, the hundreds that are claimed in 922. But it is still a very concrete way of doing this that is a real advance in the field of digital communications. They were already in the industry. They were already creating non-uniform, working with non-uniform constellations. Is it possible or plausible that they actually were, and they realized that was better in some ways, people in the industry, is it possible they were actually optimizing for PD capacity in doing that, maybe without naming it? So there's no testimony about that in this record, Judge Eken. The only thing we have in the record is at page 6097, there is an article that was in the papers and was referred to a trial, one of the co-authors is an LG employee, which credits this using parallel optimization, using parallel decode capacity, as an advance in the field, which had been focused on other things like Gaussian distributions, bell curves, that sort of thing. I will say not only is there nothing in the record about it, but having now learned more about the science here than I ever would have believed possible, I don't think there is anything outside the record that would suggest that what Drs. Jones and Barsoom did was not a real advance in the field. That graph at page 11 on the Shannon limit, I don't take the other side to be contesting that, which is to say once they come along in 2007, they publish, they do the conference, all the things Judge Stoll talked about, this is a real advance. I mean, almost overnight, these broadcasts get more efficient and you see huge gains toward the Shannon limit. So did people know about non-uniform constellations? Yes. We'll have exceeded your time. I've answered questions. Thank you very much. Mr. Wall, you have five minutes for public review. Thank you, Judge Lurie. A few quick points. Regarding damages, so the testimony from LG's corporate witness, Mr. Lewis, that Mr. Wall referred to says nothing about the value of Constellation Designs patents. So the notion that his testimony is somehow directed to how the Constellation Designs patents should be valued vis-a-vis each other, that's simply not the case. He was discussing the Zenith patent portfolio. The Zenith patents, as we discussed in our briefing, the Zenith patent portfolio is an entirely different set of patents than the Constellation Design patents, directed to an entirely different technology, technological standard. The Zenith patents were directed to VSB modulation in the original digital TV broadcast standard. The Constellation Designs patents are allegedly directed to ATSC 3.0, which involves a different type of modulation technique, OFDM. And there's just a number of differences as we've laid out in the briefing. As for what Dr. Sullivan testified regarding on appendix page 20280, he testified that it should be a one price for all, that regardless of the number of patents are infringed, that the rate should be $6.75 per unit. And that's exactly the type of legally flawed testimony that this court rejected in Omega Patents. In fact, the situation is even worse here than in Omega Patents, because at least in Omega Patents, two of the licenses included the asserted patent in that case. Even in that case, the testimony was insufficient to apply a one price, $5 per unit, regardless of the number of patents that were infringed. Here, we don't even have the asserted patents in the agreements that Constellation Designs and Dr. Sullivan were relying on to try to establish a royalty. Before you run out of time, can I ask you a really quick eligibility question? I would like to hear your response to the argument that I understand is being made that optimizing parallel decode capacity is specifically looking at comparing the information sent to the mapper on one end of the channel and the information coming out of the do mapper on the other end. And so it's much more specific than, it's not an abstract idea. It's a specific concrete idea. So we know that, at best I would say that that is a narrowing of the abstract idea. And we know from cases like BSG technology that simply a narrower abstract idea is still an abstract idea. It does not get you out of the issues under Alice Step 1 and Alice Step 2. And the parallel decode capacity, it is just a measure of the information between the coder and the decoder. And this is supported by the patent specification. And there was also a suggestion that Summer does not address parallel decode capacity. And I would point the court to appendix page 1118 to 1119. That's within Dr. Appel's report. Dr. Appel, in his expert report, went through all of these patent claims and limitations and provided his analysis for why the patent claims are directed to abstract ideas and also why the claimed elements are conventional. And he tied the Summer reference to parallel decode capacity. And I did not understand there to be any dispute that the Summer reference was about parallel decode capacity. But certainly Dr. Appel's report at the very least suggests. Yeah, but we just have to be careful not to confuse eligibility and whether something's directed to an abstract idea. That might matter for Alice Step 2, but not for Alice Step 1, right? Whether something's conventional or in the prior art doesn't matter for Alice Step 1. Two responses to that, Judge Stoll. So one, the point I was trying to make is that the Summer reference is tied to parallel decode capacity. It is talking about parallel decode capacity. And you can see that in, at the very least, Dr. Appel's report. But the other point I would make in response is that you are certainly correct that Alice Step 2 looks at what is conventional. However, for Alice Step 1, we do at least look, and this is supported by, for example, the Simio case and the... Well, what I hear your friend on the other side saying is that this is a technological solution to a technical problem. And the technological solution is looking at the information coming out of the mapper or going in and then coming out and just trying to optimize that they be as similar as possible. Is that right? And so he was saying that's concrete. It's a technological solution. Nobody ever did it before. That is just the idea, though, of using a measure to optimize a constellation for that measure. And the other point that I wanted to make was that we know from Dr. Jones' deposition testimony, he conceded that any method of optimization would meet the claim language. So any method of optimizing for parallel code capacity, that would meet the claim language. And do you believe there are more than one way to do that, to optimize for PD capacity? Yeah, and the PAT specification, I think, supports this. It talks about how the user can specify different threshold values, for example, in the optimization process. And so as a result, if it's just up to the user to set threshold values during the optimization process, that means there are more than one way to optimize a constellation for parallel code capacity because we could have two different people setting different threshold values. And that, by definition, results in two different optimization processes. Thank you, counsel. I think we have both arguments. We thank both of you. The case is submitted.